IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 31719-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| TERRY MICHAEL HOEFLER, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Terry Michael Hoefler appeals his conviction for

attempted rape of a child in the first degree, contending (1) the State failed to present

sufficient evidence to support his conviction, (2) the trial court erroneously admitted lay

opinion testimony that was not based on personal knowledge in violation of ER 602,

(3) the prosecutor engaged in misconduct during closing argument by referencing facts

not in evidence and appealing to the passions and prejudice of the jury, and (4) defense

counsel provided ineffective assistance of counsel by failing to object to the prosecutor's

closing argument. Mr. Hoefler has also filed a statement of additional grounds for review

in which he asserts (1) insufficient evidence supports the conviction, (2) the trial court

erred in admitting certain photographic evidence, and (3) juror misconduct. We disagree

with his contentions and affirm.

## FACTS

During the early morning of July 22, 2012, Terry Hoefler, Tahti Dilkey, and Kable Gunter were driving to Mesa, Washington. The truck they were in began to smoke, so they stopped to look for oil. Mr. Hoefler and Mr. Gunter left to see if they could find oil at a nearby business, while Ms. Dilkey remained in the car.

Mr. Hoefler knocked on the door of a house adjacent to the business. The door opened as he knocked, and he went inside. As he walked through the house, he saw items he could sell and started gathering them. He went into a bedroom and saw three children sleeping in a bed. He carried 11-year-old L.S. from the bed and placed her on a couch in the living room. He then placed a plastic bag in her mouth and removed her shorts. L.S. removed the bag from her mouth and started to yell. Mr. Hoefler fled.

L.S.'s aunt, Vieny Sanchez, awakened to the sound of multiple children screaming. Her boyfriend, Raphael Esparza, opened the door to their bedroom. L.S. came running to the room wearing only her underwear and t-shirt, telling Ms. Sanchez a man was in the house. L.S. appeared scared and kept saying someone was in the house and had tried to touch her. L.S. said that the man had told her to be quiet, he was just going see something, and it was not going to hurt. It took Ms. Sanchez and Mr. Esparza between 5

2

and 10 minutes to confirm the man had left the house and to call the police.

When Mr. Hoefler returned to the truck, he looked upset and told Ms. Dilkey that "a little girl . . . 'woke up'" and that "'the police were on their way.'" Report of Proceedings (RP) at 104. According to Ms. Dilkey, Mr. Hoefler moved the truck and started wiping down the interior to remove his fingerprints. Mr. Hoefler then fled.

Sheriff's Deputy George Rapp received a telephone call about 2:19 a.m. and proceeded toward the location. Approximately 4.7 miles away from the victim's house, Deputy Rapp observed a man on foot matching the description of the suspect. The man appeared to have been running. Deputy Rapp stopped the person at 2:27 a.m. and identified him as Mr. Gunter.

At most, 10 minutes had passed between L.S.'s screams and her aunt calling police, and another 8 minutes had passed between her 2:19 a.m. call and Deputy Rapp's 2:27 a.m. stopping of Mr. Gunter. The fact that Mr. Gunter was on foot and 4.7 miles away from the victim's house made it unlikely or impossible that he was the same intruder at the victim's house 18 minutes earlier.

Several hours later, police found Mr. Hoefler. He had been hiding in a canal and was wearing women's clothing and L.S.'s skirt. Officer Gordon Thomasson arrested Mr. Hoefler and took him to the Sanchez house for a showup. L.S. did not recognize Mr.

3

Hoefler, but she did notice that he was wearing her skirt. Following the showup, Officer Thomasson directed Mr. Hoefler out of the patrol car. Based on the small tight skirt Mr. Hoefler was wearing, a bulge under the skirt, and the manner in which he moved, Officer Thomasson believed Mr. Hoefler had an erection.

The State charged Mr. Hoefler with residential burglary and attempted rape of a child in the first degree. As to the attempted rape charge, the information provided that Mr. Hoefler "with intent to commit the crime of Rape of a Child in the First Degree, committed an act, to wit: pushed L.S. (D.O.B.: 03/20/2001) down on a co[u]ch and pulled down her underwear, which was a substantial step toward that crime." Clerk's Papers (CP) at 128-29.

On the first day of trial, Mr. Hoefler entered a guilty plea to the residential burglary charge. Defense counsel explained to the court, "My client's never from the inception of this case said that he wasn't guilty of residential burglary. It's the sex charge that he's contested all along." RP at 11.

At trial, L.S.'s aunt, Ms. Sanchez, described the living arrangements in her home. She identified her housemates as including her two young boys, F.S. (age 7) and I.S. (age 5); her boyfriend, Mr. Esparza; and her sister. In addition she testified that L.S., her 11-year-old niece, had lived with the family for several years. She testified about being

4

awakened by her niece's and her children's screams, fearing that the intruder was still in the house, searching for the intruder, and then calling the police.

Ms. Sanchez testified that a few hours after calling the police, and while driving to a nearby business to warn employees about a possible fugitive in the area, she saw Mr. Hoefler hiding in a canal. She armed herself with a stick and called 911 to report him. As Mr. Hoefler exited the canal, Ms. Sanchez noticed that he was wearing one of her sister's tops and one of L.S.'s skirts.

Detective Jacinto "Jason" Nunez testified that he spoke with Mr. Hoefler after his arrest at about 5:15 a.m. He observed that Mr. Hoefler was wearing a skirt and was covered in dirt. Initially, Mr. Hoefler did not want to talk to the detective. However, as the detective drove Mr. Hoefler to the showup, Mr. Hoefler volunteered that no one else was involved in the burglary and that he did not want anyone else to get in trouble. During the showup, neither L.S. nor F.S. was able to identify Mr. Hoefler as the perpetrator.

Detective Nunez testified that after the showup, Mr. Hoefler requested an interview. The detective advised Mr. Hoefler of his *Miranda*[1] rights. Mr. Hoefler told the detective that his pickup truck ran out of oil while driving with Ms. Dilkey and Mr.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Gunter. He told the detective that he walked across the street to a business to look for oil. Next to the business, Mr. Hoefler saw the Sanchez residence with several cars parked around it. Mr. Hoefler thought he might find oil there. According to Mr. Hoefler, as he knocked on the door of the residence, the door opened, and he entered the residence with the intent to take things he could sell. The detective testified:

> [Mr. Hoefler] said he entered a room. That he turned the light on, and it surprised him that there was three kids in a bed, and . . . initially he said the girl woke up because he turned the light on. Then he said that he was in a—somewhere else when the girl woke up and that the little girl approached him and that he was telling her to go away. Go back to sleep. And that she kept coming at him.
> So, then he told her to go to the couch and to be quiet, and he said the little girl kept wanting to come toward him, and then she became hysterical and . . . started to scream.

RP at 153.

Mr. Hoefler denied touching L.S. When the detective asked him why L.S. screamed, Mr. Hoefler attributed it to a communication problem. He said he ordered L.S. to sit on the couch, but L.S. kept coming toward him. Mr. Hoefler also told the detective that Mr. Gunter and Ms. Dilkey stayed at the pickup and did not enter the house with him. According to Detective Nunez, Mr. Hoefler denied trying to rape L.S. but stated, "'If I had wanted to have I could have done it.'" RP at 155.

L.S. testified that she was sleeping in her cousins' room when "the guy grabbed

6

[her]" and carried her to the couch in the living room. RP at 381, 383-84. She stated that, at first, she thought Mr. Esparza had picked her up and moved her to the couch, but she realized it was not Mr. Esparza when she heard the intruder's voice. According to L.S., the male stood in front of her, put a bag in her mouth, and removed her shorts. L.S. removed the bag from her mouth, yelled, and ran to her aunt's bedroom door. L.S. was able to identify the attacker as a white male, but it was dark and she did not get a good look at his face. L.S. was not able to identify Mr. Hoefler at the showup. During cross-examination, L.S. recalled previously identifying Mr. Gunter from a showup as the person who entered the house.

Seven-year-old F.S. testified that L.S.'s screams woke him up and that he saw the "back of [the intruder's] head." RP at 404. He described the person as bald with tattoos on his arm. F.S. saw the intruder run out of the house, and he started to scream. At a showup, F.S. identified Mr. Gunter as the intruder. During cross-examination, defense counsel showed F.S. a photograph of Mr. Gunter. F.S. identified Mr. Gunter as the man who had entered the house based on his baldness and tattoos. He did not identify Mr. Hoefler as the intruder when shown a photograph of Mr. Hoefler.

During trial, defense counsel objected to Officer Thomasson testifying that Mr. Hoefler had an erection after the showup, arguing that the opinion was "pure conjecture."

7

RP at 270. The prosecuting attorney argued that the opinion was admissible as a lay opinion because "the way an erection looks is within the common knowledge of any man and woman." RP at 273. The court agreed, finding, "This is similar to giving an opinion regarding speed, but it requires foundation testimony that the person has sufficient experience to be able to judge the speed of the vehicle, and if we have similar foundational testimony here, . . . whether the defendant did or did not have an erection at that time, I think i[s] relevant and should be presented to the jury." RP at 274-75.

The prosecutor then proceeded to lay a foundation for Officer Thomasson's opinion testimony. Officer Thomasson testified that he was familiar with male anatomy and the appearance of an erection under clothing, and described the skirt worn by Mr. Hoefler as very short and tight. He testified that he saw a bulge in the skirt as Mr. Hoefler was taken from the police car. The prosecutor questioned Officer Thomasson as follows:

> Q. [Prosecuting Attorney] Is there any way his hands or legs or knees or anything could have caused this bulge?
> A. [Officer Thomasson] No. Not [in] my opinion. There was nothing else that could explain that.
> Q. [Prosecuting Attorney] In your opinion, then, what were you looking at there?
> A. [Officer Thomasson] An erection.

RP at 279. During cross-examination, Officer Thomasson admitted that he did not lift the

skirt or examine Mr. Hoefler to confirm that he had an erection.

The jury found Mr. Hoefler guilty of attempted first degree rape of a child. The court imposed a sentence of life without the possibility of parole under the Persistent Offender Accountability Act of the Sentencing Reform Act of 1981, chapter 9.94A.RCW.

## ANALYSIS

1. *Whether sufficient evidence supports Mr. Hoefler's conviction for attempted rape of a child in the first degree*

Mr. Hoefler presents two arguments contending that insufficient evidence supports his conviction for attempted rape of a child in the first degree. First, he argues that the evidence is insufficient because the State failed to prove the acts alleged in the information, specifically, that Mr. Hoefler pulled down L.S.'s underwear and pushed her onto a couch. Second, he contends that the State failed to prove that L.S. was not married to Mr. Hoefler. Both arguments fail.

Evidence is sufficient if, when viewed in the light most favorable to the State, any reasonable trier of fact could find guilt beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980). When a criminal defendant challenges the sufficiency of the evidence, he admits the truth of the State's evidence and all reasonable inferences therefrom are drawn in favor of the State. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004).

To prove attempted rape of a child in the first degree, the State must establish that with intent to have sexual intercourse, the defendant took a substantial step toward having sexual intercourse with another who was less than 12 years old and not married to the defendant and the defendant was at least 24 months older than the victim. RCW 9A.44.073(1); RCW 9A.28.020(1); *State v. Chhom*, 128 Wn.2d 739, 743, 911 P.2d 1014 (1996). The intent required for attempted rape of a child is the intent to have sexual intercourse with a child. *State v. Johnson*, 173 Wn.2d 895, 907, 270 P.3d 591 (2012). Mere preparation to commit a crime is not an attempt, but conduct that is strongly corroborative of the actor's criminal purpose may constitute a substantial step. *State v. Workman*, 90 Wn.2d 443, 449-52, 584 P.2d 382 (1978). Criminal intent may be inferred from conduct, and circumstantial evidence is as reliable as direct evidence. *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004).

The purpose of the information is to give the defendant sufficient notice to prepare a defense. *State v. Benitez*, 175 Wn. App. 116, 124-25, 302 P.3d 877 (2013). The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to . . . be informed of the nature and cause of the accusation." U.S. CONST. amend.VI. Article I, section 22 of the Washington Constitution provides that "[i]n criminal prosecutions the accused shall have the right to . . . demand the nature and cause of the

10

accusation against him, [and] to have a copy thereof." A charging document is sufficient if it includes all the essential elements of the crime. *State v. Kjorsvik*, 117 Wn.2d 93, 101-02, 812 P.2d 86 (1991). The essential elements of a crime depend on the criminal statute. *State v. Eaton*, 164 Wn.2d 461, 468, 191 P.3d 1270 (2008). It is well settled that when the State provides additional details in the information beyond the statutory elements, those details are regarded as mere surplusage. *State v. Tvedt*, 153 Wn.2d 705, 718, 107 P.3d 728 (2005). In *Tvedt*, the Washington Supreme Court held that "where unnecessary language is included in an information, the surplus language is not an element of the crime that must be proved unless it is repeated in the jury instructions." *Id.*

*State v. Miller*, 71 Wn.2d 143, 426 P.2d 986 (1967) illustrates this principle. In that case, the State charged the defendant with assault with a deadly weapon and specifically alleged that the deadly weapon was a "'.38 calibre pistol.'" *Id.* at 144 n.2. On appeal, the defendant argued that the State failed to prove his conviction because it did not prove that the pistol was a .38 caliber revolver as alleged in the information. *Id.* at 145. The court rejected the argument, holding, "The description of the gun in the information as a .38 caliber revolver is surplusage, and the caliber of the gun does not need to be established." *Id.* at 146. The court reasoned that the type of gun was a surplus fact, not an essential element of the crime that had to be proved, and that all the State was

11

required to prove was that the defendant had a gun. *Id.*

Similarly here, the State was not required to prove the specific means of committing the crime alleged in the information. The information stated all the essential statutory elements of attempted rape of a child in the first degree. The specific facts provided in the information were surplusage and not repeated in the jury instructions. The jury was instructed that to convict Mr. Hoefler of attempted rape of a child in the first degree, the State had to prove that he took a substantial step toward the commission of that act and acted with the intent to rape L.S. And instruction 9 stated, "A person commits the crime of Rape of a Child in the First Degree when the person has sexual intercourse with a child who is less than twelve years old, who is not married to the person, and who is at least twenty-four months younger than the person." CP at 63.

The State proved the statutory elements outlined in the jury instructions. Whether Mr. Hoefler pushed L.S. onto the couch or whether he carried her makes no difference. Whether Mr. Hoefler removed her underwear or whether he removed her shorts similarly makes no difference. As the State notes, "[T]he distinction drawn between the testimony and such details is one of degree, not of direct opposition." Br. of Resp't at 14. L.S. testified that Mr. Hoefler took her from the room where she was sleeping, carried her to a couch, placed a bag in her mouth, and removed her shorts. Viewing the inferences from

these facts in the State's favor, sufficient evidence supports the conviction. *See, e.g.,* *State v. Jackson*, 62 Wn. App. 53, 55-58, 813 P.2d 156 (1991) (sufficient evidence of substantial step to support conviction for attempted rape where defendant convinced victim to enter a room, followed her into room, and then approached and ordered her to lift her skirt).

Mr. Hoefler also argues that the State failed to prove the nonmarriage element because it failed to ask L.S. whether she was married to Mr. Hoefler. However, during oral argument, defense counsel conceded that sufficient circumstantial evidence exists on this element. We agree. The State can prove the nonmarriage of a sexual offender and the victim, like other elements of the crime, by circumstantial evidence. *State v. Rhoads*, 101 Wn.2d 529, 532, 681 P.2d 841 (1984); *State v. Bailey*, 52 Wn. App. 42, 50-51, 757 P.2d 541 (1988), *aff'd*, 114 Wn.2d 340, 787 P.2d 1378 (1990).

In *Bailey*, the defendant challenged the sufficiency of the evidence where the State presented no direct evidence that he was not married to the victim. *Bailey*, 52 Wn. App. at 50-51. Circumstantial evidence presented at trial included testimony by the three-year-old victim and the victim's mother that the defendant had lived with the family for a short time and had been the victim's babysitter on several occasions. *Id.* at 51. Division Two of this court held that this evidence was sufficient for a jury to conclude that the victim

13

was not married to the defendant, noting that "[a] conviction may be based wholly on circumstantial evidence even if the evidence is not inconsistent with the hypothesis of innocence." *Id.*

Similarly, Division One held that sufficient evidence supported the element of nonmarriage where one victim was in ninth grade, had known the defendant for one month, had a boyfriend, and had never stayed at the defendant's home. *State v. Shuck*, 34 Wn. App. 456, 458, 661 P.2d 1020 (1983). And the Washington Supreme Court affirmed a conviction where the State supported the nonmarriage element with evidence that the victim in one case did not know the defendant and that the victim in another case "was under the age of fourteen years, . . . was living at home with her father and mother, [bore] her maiden name[, and] . . . was a mere school girl, and there [was] nothing in the record to indicate that she was married." *State v. May*, 59 Wash. 414, 415, 109 P. 1026 (1910); *see Rhoads*, 101 Wn.2d at 531-32 (testimony of "several witnesses" that the victim did not know the defendant constituted "sufficient evidence of nonmarriage").

Here, both L.S. and her aunt testified that L.S. was 11 years old. L.S. testified that the household she lived in consisted of her aunt and uncle, her three cousins, and her uncle's mother. She did not mention a husband or any other member of the household. Furthermore, her inability to identify Mr. Hoefler at the showup is consistent with not

14

being married to him. Nothing in the record indicates that Mr. Hoefler and L.S. were married. Thus, although there is no direct evidence that L.S. and Mr. Hoefler were not married at the time of the incident, sufficient circumstantial evidence supports a finding of nonmarriage.

2.     *Whether the trial court erred in allowing a police officer to offer lay opinion testimony*

Mr. Hoefler next contends that the trial court erred in allowing Officer Thomasson to testify to his opinion that Mr. Hoefler had an erection after the showup. He argues this testimony violated ER 602 because the officer did not have personal knowledge of the matter. He maintains that in the absence of evidence that Officer Thomasson actually examined Mr. Hoefler, the officer's opinion was speculative and, therefore, also in violation of ER 701.

Under ER 602, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony. ER 602.

The decision whether to admit a witness's testimony is an evidentiary matter addressed to the sound discretion of the trial court. *State v. Atsbeha*, 142 Wn.2d 904, 913-14, 16 P.3d 626 (2001). "[T]estimony should be excluded only if, as a matter of law,

15

no trier of fact could reasonably find that the witness had firsthand knowledge." *State v. Vaughn*, 101 Wn.2d 604, 611-12, 682 P.2d 878 (1984). It is the province of the jury to determine what weight should be given to the testimony. *State v. Linares*, 98 Wn. App. 397, 403, 989 P.2d 591 (1999). Generally, "[e]vidence is not improper when the testimony is not a direct comment on the defendant's guilt, is helpful to the jury, and based on inferences from the evidence." *State v. Olmedo*, 112 Wn. App. 525, 531, 49 P.3d 960 (2002).

Lay witnesses may testify to opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of rule 702." ER 701. The rule permits the witness to resort to inferences and opinions when such testimony will be helpful to the jury. *Ashley v. Hall*, 138 Wn.2d 151, 156, 978 P.2d 1055 (1999).

For example, a lay witness may draw on his or her own observations to express an opinion on another person's intoxication. *City of Seattle v. Heatley*, 70 Wn. App. 573, 580, 854 P.2d 658 (1993). In *Heatley*, the court reasoned that "the effects of alcohol 'are commonly known and all persons can be presumed to draw reasonable inferences therefrom.'" *Id.* (quoting *State v. Smissaert*, 41 Wn. App. 813, 815, 706 P.2d 647

16

(1985)). Lay witnesses have also been allowed to give their opinions regarding the speed

of a vehicle. *See, e.g., Clevenger v. Fonesca*, 55 Wn.2d 25, 345 P.2d 1098 (1959) *over*

*ruled in part on other grounds by Danley v. Cooper*, 62 Wn.2d 179, 381 P.2d 747 (1963).

Mr. Hoefler argues that Officer Thomasson's observations were not extensive

enough to support his opinion. But this alleged shortcoming goes to the weight of the

evidence, not its admissibility. Karl B. Tegland notes:

> In many situations it may be questionable whether the witness's
> opportunity to observe the events in question was sufficient to satisfy the
> requirement. . . .
> In situations like this, where reasonable persons could differ on
> whether the witness had sufficient opportunity to observe, the testimony
> should normally be admitted, allowing the jurors themselves to judge the
> weight of the evidence.

5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 602.2,

at 340 (5th ed. 2007).

Here, Officer Thomasson's testimony was based on his direct and specific

observations. He testified that Mr. Hoefler wore L.S.'s skirt, which was short and tight

on him. He observed the way Mr. Hoefler moved and the apparent bulge under the skirt.

Based on his firsthand observations, Officer Thomasson's testimony that Mr. Hoefler had

an erection was a permissible inference from the evidence. In the end, it was up to the

jury to evaluate what weight should be given to the officer's testimony.

3.    *Whether the prosecutor engaged in misconduct during closing arguments*

Mr. Hoefler argues that the prosecutor engaged in misconduct by referencing facts not in evidence and appealing to the passions and prejudice of the jury. To prevail on a claim of prosecutorial misconduct, the defendant must show the impropriety of the remark and the prejudicial effect. *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). Making closing arguments that are unsupported by the admitted evidence is improper. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 58, 296 P.3d 872 (2013). Prosecutors should not use arguments calculated to inflame the passions or prejudices of the jury. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Improper comments are considered in the context of the entirety of the argument, the issues in the case, the evidence, and the court's instructions. *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994). In closing argument, the prosecutor is afforded wide latitude in drawing and expressing reasonable inferences from the evidence. *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991).

To demonstrate prejudice, the defendant must show a "substantial likelihood" that the misconduct affected the trial's outcome. *Brown*, 132 Wn.2d at 561. However, if the defense fails to properly object and request a curative instruction, the issue of misconduct is waived unless the comment was so flagrant or ill intentioned that an instruction could

18

not have cured the prejudice. *State v. Charlton*, 90 Wn.2d 657, 661, 585 P.2d 142 (1978).

Here, Mr. Hoefler did not object to the prosecutor's closing argument. Thus, he must show that the remarks at issue were so flagrant and ill intentioned that an instruction could not have cured the prejudice. Mr. Hoefler first argues that it was improper for the prosecutor to inform the jury of his guilty plea to residential burglary because this "invited the jury to draw an inference of guilt from the unadmitted evidence." Br. of Appellant at 16. He identifies the following statements as improper references to unadmitted evidence:

> Let's look at the evidence we went over . . . . The defendant admits to the burglary, okay? We're not on trial today for burglary. The defendant in his statement to Detective Nunez and Deputy Conner said very clearly, "I burglarized that house."
> . . . That burglary is irrevocably intertwined with that rape—with that attempted rape. Those two things connect together, and there is no doubt that the person that committed one committed the other.
> . . . .
> . . . We also see that this burglary includes numerous items of women's and little girl's clothing.
> . . . .
> . . . So, the burglary itself very much is consistent with the act of attempted rape, and as we see what was stolen from the house and what was done to those items maybe begin to kind of unfold and unveil this motive behind what [L.S.] said happened to her that night.

RP at 484-85.

> All these circumstantial pieces of evidence really give you insight into what was going on in the mind of the defendant. Because keep in mind

19

the defendant is not gonna confess to any more than he has to when he
makes his statements. He's not gonna confess to a rape. He's gonna
confess to the burglary because he has all the items on him. He has to, but
he's not gonna tell you what's going on in his head.

RP at 491-92.

You never heard any testimony about [clothing] evidence leading
anywhere else. It's not going north or south of Glade Road right there. It's
not leading toward Mr. Gunter. It's not leading towards Ms. Dilkey. It's
leading squarely towards the defendant. There's only one reasonable
conclusion in this case.

RP at 498.

It is improper for a prosecutor to present evidence that has not been admitted at

trial. *State v. Pete*, 152 Wn.2d 546, 553-55, 98 P.3d 803 (2004); *Glasmann*, 175 Wn.2d

at 704-05. The "long-standing rule" is that "'consideration of any material by a jury not

properly admitted as evidence vitiates a verdict when there is a reasonable ground to

believe that the defendant may have been prejudiced.'" *Pete*, 152 Wn.2d at 555 n.4

(emphasis omitted) (quoting *State v. Rinkes*, 70 Wn.2d 854, 862, 425 P.2d 658 (1967)).

However, contrary to Mr. Hoefler's claim, the statements at issue here were based

on evidence that had been previously testified to by witnesses at trial. Detective Nunez

and Deputy Marcus Conner both testified that Mr. Hoefler admitted to burglarizing the

Sanchez household. In fact, Mr. Hoefler's defense rested in part on his admission that he

burglarized the house but that he was not the person who attempted to rape L.S.

20

Ultimately, this case rested on whether the State could prove that Mr. Hoefler, not Mr. Gunter, was the man who entered the home and attempted the rape. Contrary to Mr. Hoefler's assertion, the State did not use evidence of the burglary as a prior bad act or crime of dishonesty against Mr. Hoefler; rather, it used the evidence to establish that Mr. Hoefler entered Ms. Sanchez's home on the morning in question, to establish the element of intent by connecting the items of clothing taken from the house and Mr. Hoefler's intent with L.S., and to rebut the defense's theory that someone other than Mr. Hoefler was guilty of the attempted rape.

Mr. Hoefler also alleges that the prosecutor committed misconduct by focusing on the screaming and crying of the children rather than the evidence of attempted rape of a child. He argues that the remarks appealed to the passion and prejudice of the jury by "encourag[ing] the jury to find Mr. Hoefler guilty because the children were terrorized by someone." Br. of Appellant at 19.

This argument fails. During closing, the prosecutor argued:

We see the child, we see the testimony, we see the aftermath. We heard Vieny and Raphael describe that there was terror in these children, this screaming and yelling. The way a child would react in those circumstances.
. . . .
We saw the tears in [L.S.]'s eyes when she said what that man tried to do to her.

RP at 482-83.

21

A prosecutor has a duty to seek verdicts free from appeals to passion and prejudice. *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988). However, "[a]rguments which may evoke an emotional response are appropriate if the prosecutor restricts his argument to the circumstances of the crime." *State v. Brett*, 126 Wn.2d 136, 214, 892 P.2d 29 (1995). The prosecutor may properly comment on the evidence presented at trial. *State v. Fleming*, 83 Wn. App. 209, 216 n.3, 921 P.2d 1076 (1996). The evidence at trial established that L.S. and F.S. were crying and upset when they saw the intruder in the house. Ms. Sanchez testified that the crying and screaming of the children awakened her. F.S. testified that L.S.'s screaming awakened him. And Mr. Hoefler himself told Detective Nunez that L.S. began screaming when she saw him. The prosecutor's argument was based on this evidence and was not overemphasized. His argument did not cross the line into passion and prejudice.

4.      *Whether defense counsel was ineffective*

We review ineffective assistance of counsel claims de novo. *State v. Binh Thach*, 126 Wn. App. 297, 319, 106 P.3d 782 (2005). A criminal defendant has the right to effective assistance by his or her counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). We begin with "a strong presumption that counsel's performance was reasonable." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). To overcome this

presumption, the defendant must show that counsel performed deficiently and that this deficient performance prejudiced him or her. *Grier*, 171 Wn.2d at 32-33. To show deficient performance, the defendant must show the absence of any legitimate strategic or tactical reason supporting defense counsel's actions. *Id.* at 33. If Mr. Hoefler fails to establish either prong of this test, our inquiry ends and we need not consider the other prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

Mr. Hoefler argues that defense counsel was deficient for failing to object and move for a mistrial when the prosecutor mentioned Mr. Hoefler's guilty plea to residential burglary during closing argument. He also argues that defense counsel was deficient for drawing attention to the guilty plea by emphasizing during the defense's closing argument that Mr. Hoefler had admitted to the residential burglary.

As previously discussed in the prosecutorial misconduct section above, the prosecutor's references to Mr. Hoefler's admission of guilt relating to the residential burglary were not improper. Therefore, defense counsel cannot be deemed deficient for failing to object to the remarks.

Moreover, defense counsel's statements during closing argument evidence a tactical decision to shore up Mr. Hoefler's defense and impugn Mr. Gunter's credibility. During closing argument, defense counsel argued:

23

> Mr. Gunter wants you to believe that he never went in the house. Tahti said they did. They both headed in that direction. . . .
>
> I don't know. We don't know. There was no evidence presented whether they went in together, whether they went in separately, whether they both knew one another is there or not. That we do not know. The children only see one individual, and they see him (indicating [Mr. Gunter]). *Mr. Hoefler admits to the residential burglary. He admits to it. He's admitted to it. Taken responsibility.*

RP at 504 (emphasis added).

Mr. Hoefler claims this italicized portion of closing argument was prejudicial because "it invited the jury to consider evidence that [he] was guilty of a crime that was not before the jury but that was committed at the same time as the crime at issue." Br. of Appellant at 22. His argument ignores defense counsel's trial strategy. By telling the jury that Mr. Hoefler had "[t]aken responsibility" for the burglary, defense counsel hoped to show that Mr. Hoefler had accepted responsibility for his limited part of the crime but that Mr. Gunter, not Mr. Hoefler, was responsible for the attempted rape.

During closing argument, defense counsel emphasized, "The reason to doubt this case is because you have two individuals, the only two who saw who was in that house that day, tell you that this [Mr. Gunter] was the man that was in that house that day." RP at 502. Because a legitimate tactical reason supported defense counsel's discussion of his client's guilty plea to residential burglary, Mr. Hoefler's ineffective assistance of counsel argument fails.

24

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW (SAG)

Mr. Hoefler filed a SAG raising five additional grounds for review. In grounds 1, 2, and 5, he argues that the evidence points to Mr. Gunter as the perpetrator of the attempted rape. In support of his argument, Mr. Hoefler points to the evidence that F.S. and L.S. identified Mr. Gunter as the intruder in the house and the fact that Mr. Gunter was found running from the Sanchez house. Without explicitly stating so, Mr. Hoefler is challenging the sufficiency of the evidence. However, the weight, credibility, and persuasiveness of the evidence are matters for the trier of fact. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992), *abrogated on other grounds by In re Pers. Restraint of Cross*, 180 Wn.2d 664, 327 P.3d 660 (2014). The jury heard the children identify Mr. Gunter as the person who entered the house. It was free to decide the weight to be given their testimony.

Mr. Hoefler also contends that the court erred in "allow[ing] some photos to be admitted as evidence in the middle of the trial that were not given to the defense before trial." SAG at 2. He claims that "the photos showed nothing, but the new line of questioning that they allowed . . . was damaging to my case." SAG at 2. Unfortunately, Mr. Hoefler does not identify the pages in the record where this "damaging" questioning occurred or cite to authority to support his position. Without more, we are unable to

25

address the issue. An appellate court will not consider a defendant's/appellant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged error. RAP 10.10(c).

Finally, Mr. Hoefler argues that one of the jurors was making "funny faces" during "the morning trial session." SAG at 3. He also contends that a juror was improperly allowed to stay on the jury despite hearing "feedback" from a microphone close to a sidebar conversation. SAG at 3. Again, Mr. Hoefler fails to cite to the record or pertinent authority. Accordingly, we are unable to consider the issue.

Affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Brown, A.C.J.

Korsmo, J.

26